24-2269 Smart Apparel v. Nordstrom, Inc., 24-2269 Smart Apparel v. Nordstrom, Inc. May it please the Court, Chris Cariello for Appellant and Plaintiff Smart Apparel. I'd like to reserve three minutes for rebuttal, please. We're at the pleading stage, so our allegations must be taken as true and for all they are worth. And what those allegations plausibly allege is that Nordstrom, with too many shirts in its inventory, used a CBP press release as a false pretext to get out of $6.7 million in purchase orders. And so the only question at this stage is and should have been, does canceling a purchase order based on a pretext that is knowingly false give rise to a claim for breach of contract or breach of the implied covenant of good faith and fair dealing? The District Court erred in dismissing both claims before discovery. But you have an allegation that Nordstrom actually knew, but it has to be a plausible allegation, right? It can't just be an assertion, right? Absolutely, Your Honor, and we went chapter and verse and gave specificities to that allegation. Well, I understood this troubled the District Court, but I think the complaint, your complaint alleges that the parties had a multi-year relationship, I want to make sure I didn't miss anything in terms of fleshing this out, a multi-year relationship that Smart Apparel had provided quarterly audits and then in response to Nordstrom's actions, Smart Apparel conducted additional audits of its entire supply chain. Are there other assertions in your allegations, in your complaint that factor into this? So we've also, we also allege this with the depth of the relationship. So we allege that Nordstrom and Smart Apparel actually collaborated. We allege that Nordstrom understood the location of the four facilities at issue. So factories that make the shirts in Sri Lanka, mills in China and Vietnam. I know that location helps you a lot, but you did allege that, okay. I'm happy to explain why. It's because it goes to the depth of Nordstrom's understanding of Smart Apparel's supply chain. And so when you have a... What's the part of your complaint that gets a little bit muddy, though? Because it also talks about the locations of supply for Sunshine, and it's not entirely clear to me that they are separate. So all the complaint stands for when it comes to Sunrise and the overlap between the supply chains is, it's largely in paragraph 10 of the complaint. And it says Sunrise has dozens of factories, of facilities in its supply chain, and Smart Apparel has four. These are the four. But you can't tell if the four are part of the dozens. That's the point. So... You can't tell if they're separate. So, so I, you're, you're right that the complaint does not specify. It's ambiguous. And even if it weren't, there's a difference between, okay, these are some, these are sort of nominally part of Sunrise's supply chain, or they're operationally, you know, making shirts side by side. I will concede that it is not on the face of the complaint. Well, I'm not trying to get you into the, completely into the minutiae, but, you know, that's what you're relying on heavily, is that the complaint alleges that Nordstrom actually knew that there was not forced labor being used. And so I think the district court was concerned that that was a mere allegation, and I'm trying to just make sure I have all of what you intend for me to consider about how that allegation is fleshed out so that it's not just conclusory. Understood, Your Honor. So I do want to start by noting this is an allegation of state of mind at the pleading stage. Very rare for a, for a complaint to be dismissed on the basis of what we were unable to allege about the defendant's state of mind. That's what discovery is typically for. But if we're talking about giving rise to plausible inferences, again, we, we alleged Nordstrom's understanding of the way these supply chains work. We in fact also alleged, and I can grab, I can grab this site. We also alleged that Nordstrom knew or could easily discover that Sunrise uses dozens of factories with nothing to do with smart apparel. That's ER 40 paragraph 62. But the terms and conditions don't require that Nordstrom do that, I don't think. That's, that's pretty tough. Maybe if you talk about the covenant claim, but, right, the, the terms and conditions just require that if, if, if Nordstrom has reason to know in good faith, reason to know in good, or reason to believe in good faith that one of these warranties has not been abided by, then that's enough. That's what they're going to take, argue, right? No, no, that, that is what they will argue. They didn't have an obligation to do an investigation. Right. So, and we, and we are not arguing that there's an obligation to do an investigation. We'll get to the good faith. I thought you were. What, what, what point were you just making? Oh, the point I was just making was, was based on knowledge. So what I said was Nordstrom, we, we alleged that Nordstrom has deep, a deep understanding of the facilities that smart apparel uses. So these four, it's seen third party audits, audits, it's collaborated on these audits. They've been cleaned for years. We know, but what were you just saying about Nordstrom being able to check? Yes, Your Honor. And then what I was, what you were asking about the overlap between Sunrise and smart apparel. And then what I was saying was Nordstrom's understanding of this supply chain. We went further and alleged that Nordstrom knew or could easily discover that there were many Sunrise facilities that had nothing to do with smart apparel. Or could easily discover part that is tripping me up, but I don't mean to, I don't think they had to do that. So understood, Your Honor. All right. All right. That's fine. So the point that I am trying to make is that you need a leap to get from a CBB press release as to Sunrise and Sunrise's supply chain to get to smart apparel and smart apparel supply chain. And that leap. Well, there are no allegations in the complaint that tell us what the relationship is between Sunrise and smart apparel. Is Sunrise a parent company? Sunrise is the parent, yes. And were any of its goods impounded by Customs and Border Protection? Never. At no time was anything ever detained. Does the complaint allege that the presumption was rebuttal and that it was rebutted or does it just allege no goods were ever impounded? Just that no goods were ever detained at all. It was never required to demonstrate the absence. That's key, I think, to your argument that this was not ever a sanctioned person. Absolutely. So this was never, first of all, the CBB press release. And the way that 22 U.S.C. 9241A functions is it creates a presumption as to goods, as to shipments. It doesn't designate a status of a party. That's A. And B is, when I say A and B, I'm talking about my argument, not the statute. And B is it's not a final determination at all. It is a rebuttable presumption. So the press release... Oh, please. I'm sorry. I mean, normally, and I'm no expert on import-export law, but normally the goods are seized at the port of entry and placed in a bonded warehouse and then notices sent out to the shipper identifying the fact that the goods have been impounded and then the shipper has to take some action in order to release. It may be post a bond, started an administrative proceeding to challenge the seizure. You're saying there are no allegations that this ever occurred with anybody's goods. That's correct. That's correct. All we have, I think, is Nordstrom. And I think Nordstrom is pretty straight up about this. They relied on the press release, right? I think that's absolutely right. That pertained to a different party and I think pertains to a rebuttable presumption. Exactly right. Exactly right. And if you look elsewhere in the law at the way these sorts of rebuttable presumptions work, I mean, think for example of, you know, in the employment discrimination context, the McDonnell Douglas standard, right? If a plaintiff files a motion for summary judgment and makes out a prima facie case against the defendant, you would never say, oh, well, here, I have this motion for summary judgment, therefore I've concluded that the defendant is a discriminator and that is final and it's a breach of warranty. You would say, okay, the presumption has shifted the burden to that party to demonstrate they've done nothing wrong. So Sunrise itself, which again is not smart apparel, Sunrise always retained the ability to import into the country upon satisfying this condition. It could show we never used North Korean labor. It could show we employed North Korean nationals who fled an oppressive regime and they were never subjected to forced labor. It could show this had nothing to do with any facility that CBP was ever talking about. What ended up happening is nothing was ever detained. And then, and then three or four. By the time Nordstrom took this action, Nordstrom reacted, I think, pretty quickly. So the 30 days hadn't lapsed, had it? Nordstrom reacted the following month. So press release, December. So there would have been time, there would have been a 30 day lapse? For Nordstrom to know that there were no detentions. I don't think Nordstrom would have known at that point, if I'm being totally fair, that the complaint doesn't disclose it. The reason we emphasize that there were never any detentions and that a later third party audit confirmed that, that CBP was wrong. There was no North Korean labor. After Nordstrom took this action and canceled the order, purchase order, you're, you alleged that some contingent of your client came to meet with Nordstrom in, I think it's Seattle? Yes. That was after they had already canceled the order, right? Right. Within days after they canceled the order. So, so Nordstrom says we have reason to believe, right? It's terminating on reason to believe. Not we have found you breach day warranty. But the audits had been delivered to Nordstrom prior to them raising the flag to say they have reason to believe. The audits of smart apparels facilities, yes, have been delivered quarterly. The most recent one is November 2022, a month before the press release.  Judge Clifton, do you have any questions? Mm-mm. It looks like we don't have any additional questions. Thank you, Your Honor. I'll reserve the remaining area of my time for rebuttal.  That's fine. Thank you, Your Honor. May it please the court. My name is David Perez. I work at Perkins Cooley, and I'm proud to represent Nordstrom in this matter. There was something you asked about, which I wanted to address, which was timing. It was two and a half weeks after the press release. So it was within those 30 days. Nordstrom cancels it within two and a half weeks. The press release also on the subject of timing came after the audits. So these audits were actually facility specific, not supply chain wide. So these one-off facilities were audited. Two of those audits occurred in 2021. So the press release actually uncovered evidence after the audits. The chronology that you're just describing is entirely consistent with my earlier question as I'm with my notes and with the briefing. I think we've all got that. Got it. But you've got a problem, right, that we're at the 12B6 stage, and they allege that Nordstrom actually knew that forced labor hadn't been used. And I think your position in the trial court was that that was too conclusory, and I'd like to hear what you think that is.  And it goes actually back to timing, if I might tease that out. Because they're saying, you knew because of our audits. So you must necessarily, as a matter of law, believe our one-off facility audits. And the district court looked at this and said, well, first off, the terms- As a matter of law? I think they're alleging that as a matter of fact, you actually knew. Right. But we're going to- Does that matter for your argument? We can have a reason to believe post those audits that the press release, which says we've uncovered, based on evidence, that these entities are using North Korean labor- East, plural? Or Sunshine? Say that again? Sunshine, right? Sunshine. The parent company of Smart. Well, you just said entities. And I want to know if I'm- Oh, sorry. There were two entities late- But it's not Smart Apparel. It's not Smart Apparel. Smart Apparel is the ultimate, is the subsidiary wholly owned by Sunshine. It's Sunshine and then Smart. I understand. Yeah. So the terms and conditions say that Smart Apparel cannot have dealings directly or indirectly, or any dealings directly or indirectly, with entities that might be subject to sanctioned territories or sanctioned parties themselves. What's your best argument that after the press release that Nordstrom had reason to believe that Sunshine was a- or actually that Smart Apparel was dealing with a sanctioned person? The press release itself notes that Sunshine's products will be detained at the port. The press release itself is effectively make Sunshine a sanctioned person under the contract. What's a sanctioned person? There's a rebuttable presumption that arises by virtue of the legal authorities that your purchase order cited. That's right. There's a rebuttable presumption that they must rebut by clear and convincing evidence. So if you go back, kind of turn back the clock on the investigation, to trigger investigation, a port director must receive a- must submit a report that he had- he or she has a reason to believe that forced labor or child labor is being used. That triggers the investigation. So just to trigger investigation in the CFRs, there must be a reason to believe. The investigation- Somebody had a reason to believe. Bingo. Right. And then the investigation itself went further and uncovered evidence. So now we're beyond- The first step in the process is not the step that Nordstrom invoked in its agreement. We didn't know about the investigation when it was triggered. What I'm saying is- I'm talking about the legal provision, counsel. Right. The legal provision, we triggered our rights upon receiving the press release because CBB sends this to buyers like Nordstrom. And Nordstrom seeing this, an objective reader, an objective buyer in Nordstrom's position, whether we're Nike or The Gap, would say, okay, within this supply chain, we now have a reason to believe that North Korean or forced labor or child labor is being used. Now it doesn't matter to Nordstrom whether those products are being sent to Gap. But trust us, your products, the ones we're sending to you, don't have North Korean labor. So long as the supply chain itself has been implicated in North Korean labor, that's enough. Whose supply chain? The parent company's supply chain within which Smart Apparel resides. There was some ambiguity in the complaint that they're saying on appeal, that it's not clear. But even at the complaint, the complaint's paragraph, in paragraph 10, the complaint said that Sunrise uses dozens of mills and factories in its supply chain, Smart Apparel used only four, and this is their words, which makes it exceedingly unlikely that one of Smart Apparel's mills or factories had been implicated. Not that it's zero. We understand. And then, well, that's the reason to believe. We could have a reason to believe, even if it's unlikely. And so we keep coming back. And I know you're not pushing back on that, counsel, but it all comes back to, you know, my scorecard. We have very detailed notes here. What is your best, at the 12B6 stage, the legend that Nordstrom actually knew because of these, and we went through it a minute ago, right? Multi-year relationship, quarterly audits, and so on and so forth. What's your best shot at this? The press release itself, in our view, could trump the audits. We can have seven reasons to believe that they are clean, and we only need one reason to believe that they are not. This is how- Is that really true? If you had seven reasons to believe to the contrary, and you get some discordant, in this case, press release, does that really give a reason to believe to assume the first seven reasons don't count? Reason to believe suggests more than a possibility out there. Sure. That's where we tease out whether it's a contract claim or the good faith and fair dealing claim. Under the contract, yes, that would be enough. Now, the contract- Well, if you determine that's reason to believe, but reason to believe considers all the knowledge that, in this case, Nordstrom had. I'm not sure you can just say, well, you got this one little thing out there. We're entitled to disregard everything else that we know or have been told because it's one- Correct. That's not true under the contract either. And that's fair. What we're saying, the press release itself would have been enough because it came after the audits, audits that came, two of which came two years before the press release, but single facility audits, and the press release itself implicates the entire supply chain. Well, you keep talking about the supply chain, but what's bothering me is the complaint is ambiguous as to what the relationship is between Sunrise and Smart Apparel. Were there any documents that Nordstrom had that lists Sunrise as being involved at all in the distribution of these products? So the supply chain, I think as a grammatical matter, if you read the paragraphs actually alleged in the complaint, paragraphs 10, I believe it's paragraph 10 and 62- But Nordstrom didn't respond to those. Nordstrom acted, pulled the trigger after the press release. Correct. In fact, I'm saying now they're making this argument, or at least suggesting the argument, because I'm not sure I'm saying, I don't think they've actually expressly said that the supply chains are separate. They're simply saying- No, but you're suggesting that since the press release pertained to the parent, that that's enough because, and I think you're asking us to assume that the supply chains are coextensive. The press release actually did not make a distinction between the press release actually implicated the entire supply chain. It did not say, in fact, in paragraph 60- The press release doesn't mention Smart Apparel. No, it does not. It just says Sunrise. Correct. So that's why I keep asking you, whose supply chain are we talking about here? Because I don't know how the goods got from Sunrise's other manufacturing locations to the Gap or any other US entity, and you're assuming for purposes, and the problem is we're doing this on a motion to dismiss, it's not even summary judgment yet. We're assuming that the Smart Apparel goods somehow got co-mingled in the supply chain from the four factories where they were manufactured, and that this somehow tainted Smart Apparel's goods, and that's the problem I'm having. Right, and that's why if we fall back on the contract language, the contract language itself is very intentionally written broadly, that if Nordstrom has any reason to believe that Smart Apparel has- You concede that it has to believe in good faith. Oh, absolutely. Absolutely. I wouldn't have known that from your briefing. We would argue that the good faith is on the face of the press release itself, but the contract language written broadly, Nordstrom has a reason to believe that they're having direct or indirect dealings, or any sanctioned person has an interest in Smart Apparel, and of course Smart Apparel is wholly owned by Sunshine Group, that that itself is enough for Nordstrom to have a reason to believe under four parts of the contract to terminate the provisions. And there's a strong policy reason for that, too. You don't want retailers to then be able or be forced to play a shell game where your parent company is implicated in North Korean labor, and the policy of cancel is supposed to be broadly written. We want to eliminate these goods from the U.S. economy. What's your best argument and response to if there's an allegation that there was an interest between the two, that that gave Nordstrom the right to cancel the order? The contract language itself says that if any sanctioned entity has an interest in Smart... I'm asking you to respond to the argument that is in his briefing. Which argument? That even if this is the case, even if the sanctioned person had an interest in Smart Apparel, that didn't give Nordstrom the right to cancel the purchase order. Oh, and that's... Their arguments say that we have to tie it to specific purchase orders, and that goes back to the policy... Well, two arguments. One is the policy argument, and one is the contract argument. We don't want to have forced retailers like Nordstrom or Nike or The Gap to say, well, this particular order may have been clean, but you're still selling child labor products to The Gap or American Eagle. We're not going to countenance that. We're not going to say and tell the public because of our brand, our products are clean. Trust us. They're only sending North Korean products...  It's your language, and your language talks about the sanctioned person, and this is the second warranty, but it requires it in connection with this order.  Nordstrom authored this agreement. Correct. So now you're trying to walk away from this provision. If they have... By virtue of... You're not going to countenance that. This is the provision that you wrote. Right. And what we're saying is, it's of course in connection with this order. If you have... If the parent company has an interest in the child, and the parent company is being sanctioned, and in this case, we think just by its plain terms, it's a sanctioned party, then that parent company has an interest in connection with all the orders. It's a sanctioned party because a rebuttable presumption had arisen? At the moment of the press release, the CPB was announcing that under CAATSA, their goods were being held at all ports of entry. But their goods weren't held. Under CAATSA, what it says is that we've announced that we're going to hold them. Correct. Unless you rebut this presumption within 30 days. Yes, and we don't... Again, that's a provision Nordstrom drafted. That's true. And in that moment, we could have a reason to believe that they're a sanctioned person, and a sanctioned person has an interest in... At that moment, you have a reason to believe that they're not going to be able to rebut the presumption within 30 days. Right. Well, they're going to need clear and convincing evidence. And clear and convincing evidence is higher than a reason to believe. And good faith. Correct. You have got to act in good faith. Correct. This is a provision that you drafted. It pertains to the parent, and what you're saying is two and a half weeks in, Nordstrom had a good faith belief that the parent wasn't going to be able to rebut the presumption within 30 days. If I'm following you correctly, you are. Yes, and we're saying that the contract doesn't give a notice and cure period and say we must do further investigations. I think I heard counsel concede we don't have to investigate ourselves or look at subsequent audits. But then circle back to Judge Clifton's point. Sure. Which is what you're saying is that this was enough. Never mind the course of dealings. Never mind the history. This is enough, and we can do this in good faith. We can. What's your best shot? What's your best argument, authority for that? Okay, so one case that might address both the contract and discretion was the Amazon case. This is Haywood v. Amazon. This is 2023, also arising out of Western District of Washington. And in that case, Amazon removed a plaintiff's book reviews and then banned him from posting for violating his terms of use. His terms of use gave Amazon that discretion. And in dismissing it under 12b-6, not a summary judgment, the court held that the conduct was expressly authorized. And I'll quote. Was there rebuttable presumption involved in that case? No. Amazon just had the discretion under the terms of the... Right. So Nordstrom has discretion under the terms of this purchase order, to be sure, but it has to act in good faith. Yes. And this rebuttable presumption is a big problem for you, pursuant to questions that all three of us have asked. So why does this Amazon case help you, if there's no rebuttable presumption? The reason being that nothing in the contract forces us to wait until they do or do not rebut that presumption. Once we have... The moment we have a reason to believe, we can act on that belief. Now, they might disagree... They haven't been sanctioned yet. Even the parent hadn't been sanctioned, is the point we're all trying to make. Right. The parents... They had been... The CBP had announced that it was going to withhold or hold its products. Whether those products were... If. If something else happened. There was a condition that had to happen.  Impoundment. That's what has to happen. That's the problem I'm having.   Well, just because the goods may not have actually arrived to be withheld within those 30 days, doesn't mean they would not have been withheld. What about the goods that already came in? Did Nordstrom's continue to sell those? The ones that were already on the shelves, Nordstrom did not return the smart apparel. The contract didn't allow us to return them or force us to seek a refund. There's all sorts of good policy reasons why we wouldn't want to force retailers. There's sort of an elephant in the room, too, because they've alleged, as part of the bad faith claim, that Nordstrom's had an ulterior motive. It had an oversupply of dress shirts, and we're conscious of people dressing differently thanks to the pandemic. Why doesn't that factor into whether Nordstrom behaved in good faith? I have to say, and granted we're motion to dismiss, we take the allegations of the complaint, but I've read lots of briefs, and when there's an allegation like that, even if it's not in the complaint, the defendant always makes a point of saying in their briefs, it's not true. I didn't see any mention of the subject whatsoever in your brief. Was it true? We don't know what happened to those shirts that were on the rack, and the complaint alleges we continue to sell them, which is somewhat contradicts that the shirts weren't selling, but taking that as true, the contract never required us to terminate and also pull everything off. You're missing the point. You're misunderstanding the question. You're missing the point. The point is that they allege that Nordstrom had an ulterior motive to exercise this right, so they grabbed on a pretext, and I never heard anything from you today. I never saw anything in the brief that suggested that's not true. So we do argue in the brief that a party exercising its rights under a contract can have multiple motives. That's not a really good argument if, in fact, the elephant is still in the room, because it suggests that Nordstrom didn't pay attention to its economic concerns and acted on those economic concerns to cancel the contract because it could, not because there was real justification for it. So am I left with that impression?  If I may respond, I think it's easy to criticize retailers or buyers in this position for, you know, if you were to terminate an agreement in this sense and cancel an order, to then punish them or see differently because they don't then pull all the shirts off. I really think you're missing this question. Whether the shirts weren't selling is the point, and the shirts could have been selling hot. They could have been selling cold. The allegation is you had a warehouse full of shirts. They weren't on the shelf. And then you got six million more coming in that you don't want because they're not going to move. That's what the complaint alleges. I think that goes to the good faith and fair dealing claim, absolutely. Not necessarily just a pure contract claim, but absolutely if Nordstrom could have ulterior motives or multiple motives in any complex organization, there might be several people saying it's going to be easier or harder for us to pull the trigger on here. We don't have enough shirts. We need their shirts, let's say, the inverse hypothetical. We need these shirts. We don't have enough shirts. But Nordstrom can still stand on its rights, and it's not any more or less persuasive if the shirts were flying off. It's much less persuasive. In fact, Nordstrom was acting affirmatively for its economic interests to look for a pretext to cancel a contract for shirts it didn't want to buy. And you're trying to tell me, well, the opposite could happen. Nordstrom's could decide to cancel a contract even if it was unfavorable to Nordstrom's. That doesn't help your case here because the allegation, which we have to take at face value, is that Nordstrom's acted not because of its concern about the potential involvement of North Korean labor. It acted because it had too many shirts and was desperate for reason to cancel this order. Right. And with that allegation, it's hard for me to see how the action by Nordstrom couldn't be characterized as being at least a breach of good faith and fair dealing, and frankly, I think probably a breach of contract too, if that allegation stands. And there's been no denial, not just that we're on a complaint, motion to dismiss, got that, but there's been no denial of the fact is actually true. Well, we can't deny a fact. Sure you can. We get briefs all the time that tell us, by the way, this isn't true, and I didn't see anything like that here, and I didn't see an argument that dealt with that. We did, in passing, say that wasn't true in the brief, and to be clear, you know, as a practical, just to take a step back, as a practical matter, it is actually exceedingly difficult for a retailer to replace a vendor like Smart. It is a difficult decision to pull the trigger on a cancellation of an order this size. As a practical matter, there are supply chains you rely on, and to replace a supplier like Smart is not an easy decision. If you've got warehouses full of dress shirts that aren't selling very well, maybe it's not such a hard decision after all, but that's the allegation we have, so. No, and that's fair, and so ultimately, to circle back to what's our best case, the Amazon case also stands for the good faith and fair dealing, and I do believe that if you agree that Nordstrom was standing on its rights, if the press release was enough, and we are over time. So, I think your position, and I think you articulated this a couple times in your briefing, is that if you, if we conclude that Nordstrom had the right to do this, it could not have violated the covenant of good faith and fair dealing. Correct. We got it. Okay. Thank you very much for your argument. Thank you, your honors. Just a few very quick points. Judge Kristin, you noticed, you noted that much of Mr. Perez's argument hinges on this premise that the supply chains are coextensive. Simply put, Nordstrom is not entitled to that inference at this stage. The inferences need to be drawn in Smart Apparel's favor. Judge Clifton, you noted the reason to believe standard. Nordstrom's reading of reason to believe reads it to say something very subtly, but very importantly different. They read it to mean a reason to believe, ignoring all other facts that they know. That is incorrect for reasons we explained. Nordstrom itself invoked official standards of knowledge or likelihoods that are much like this that require a sort of cautious, prudent person to take into account all relevant facts. Judge Kristin, you asked about our argument that the sanctioned person provisions wouldn't permit termination because they aren't shipment or merchandise related. We pointed to Washington law explaining that warranties, the default rule, is typically their promises or covenants. They're not conditions that would permit non-performance. Now, you can modify that, and the parties did in paragraph four, but if you walk through paragraph four and the grounds for which Nordstrom cannot pay for orders it has made, every one of them starts with merchandise, merchandise, shipment, shipment, merchandise, which limits this modification of the default rule meaningfully. I didn't get a chance to say much about the good faith and fair dealing claim, and I won't say much about it here. The relevant allegations are at ER44 paragraph 78. We allege not only starting in complaint paragraph one that Nordstrom did act in bad faith and on a pretext. For good measure, we added the economic motivation for that. We provided the facts and circumstances. We noted that Smart Apparel flew to Seattle in the days after to demonstrate that the supply chain was clean. We noted an audit three or four months after demonstrating that CBP was simply incorrect. That is more than enough to give rise to an inference of bad faith pretext. Were your clients able, I realize this is not in the complaint, but in that presentation to show that the goods came by a separate supply chain and were not commingled with other Sunrise goods? So it's not in the complaint. The complaint does flatly allege that we demonstrated to Nordstrom that the supply chain was clean. This is a point of pride and an existential aspect of Smart Apparel's business to be able to demonstrate over and over and over and over again throughout the years that there's no forced labor in the supply chain and trace it, document it rigorously. So no, it isn't in the complaint exactly what happened. That can come out on discovery and we can demonstrate it. It's a point of pride for Nordstrom too. And that's part of what he's telling us. They didn't want to countenance any such practice and I think that's to be commended for sure. So what is it that Nordstrom should have done? So Nordstrom- The press release would certainly have gotten their attention. So the good faith and fair dealing standard, and we cited numerous cases that go just this, but Microsoft versus Motorola is an example. Scribner is an example. Describe this obligation as cooperating in good faith to ensure that- Tell me what they should have done. What does that mean? They get this red flag. They really want to abide by this law. They don't want forced labor. So what were they supposed to do? So I want to make clear that we are now operating in a world where we're inferring that they actually are in good faith and they aren't just trying to- Yes, I am. I'm asking you to do that and you have one minute and 20 seconds. Yes, understood. So in that world where they actually genuinely do believe it, I still think good faith requires taking a phone call, listening to evidence-  Your complaint says as much. They took your phone calls. That when we demonstrate, as we did and must be taken as true, that the supply chain is clean, that no warranties were breached, that they pay for the orders that they made. When Nordstrom makes an order, they ask Smart Apparel to spin up their factories and make 350,000 shirts and then they say, okay, we saw this press release. We have reason to believe. We don't have sort of an understanding that you've breached this warranty and we're not saying that. We just have reason to believe. Give us your explanation and we demonstrate that all of these shirts, 350,000 of them worth $6.7 million, were made as they have been for years on end. Did the protocols that were incorporated into the purchase order call for that kind of cooperative communication? The duty of good faith and fair dealing calls for that kind of cooperation. I know about the duty of good faith and fair dealing counsel. I'm asking a different question? No, so there aren't any specific terms that say here is what Nordstrom has to do. It has to call up- The incorporated protocols require that? In the vendor purchasing guide or anything? Yeah. So I'm not sure. I'm not sure if they do. I'm not either. It wasn't a trick question. I just wondered if you knew. I want to thank you for your advocacy, both of you, and we'll take that case under advisement and we'll stand and resist for the week. Thank you.
judges: TALLMAN, CLIFTON, CHRISTEN